**THE HABA LAW FIRM, P.A.**
Lisa D. Haba (*Pro hac vice*)
*lisahaba@habalaw.com*
1220 Commerce Park Dr., Ste 207
Longwood, FL 32779
Telephone: (844) 422-2529

*Attorneys for Plaintiffs*

**MARSH LAW FIRM PLLC**
Robert Y. Lewis
Margaret E. Mabie (*Pro hac vice*)
*margaretmabie@marsh.law*
31 Hudson Yards, 11th Floor
New York, New York 10001
Telephone: (315) 296-9046

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

SARAH and REGINA ALONSO,

    Plaintiffs,

    v.

GOOGLE LLC, YOUTUBE LLC, JAMES JACKSON, also known online   as "ONISION," and LUCAS JACKSON, formerly known online as "LAINEYBOT," "LAINEY" and "KAI,"

    Defendants.

CASE NO.: 3:23-CV-05523-VC

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

This is a civil action for damages against YouTube and its parent company, Google, James Jackson known online as "Onision," and Lucas Jackson, formerly known online as "Laineybot," "Lainey," and "Kai," under the federal statutes 18 U.S.C. § 1595, Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 2255, Civil Remedies for Personal Injuries, and related state law claims arising from Defendants' conduct when it granted an agency and/or profit-sharing relationship to a predator, Onision, that used YouTube to identify, recruit, solicit, and groom, children, and coordinated with his spouse, Lainey, to lure, entice, and solicit children for the ultimate goal of engaging in sexual activity with them.  Plaintiffs were two of these victims.  Plaintiffs respectfully submits their complaint for damages and makes the following averments:

## INTRODUCTION

1.    This lawsuit will reveal how Google's YouTube Partnership Program through the YouTube platform enabled, facilitated, and profit-shared in the identification and grooming of vulnerable children by two adult predators known as Onision and Lainey.

2.    Defendant James Jackson, a/k/a "Onision," is a predator who, when faced with the allegations raised against him, began a series of attacks against the victims online in an effort to intimidate and threaten his victims into silence.

3.    Defendant Lucas Jackson, a/k/a "Laineybot," "Lainey" or "Kai," is married to James Jackson, a/k/a "Onision," and used new fame as Onision's spouse to lure and entice underage children to engage in sexual acts and exchange Child Sexual Abuse Material ("CSAM")[1] images with her online.

---

[1] While federal statutes still use the phrase "child pornography," that phrase does not adequately reflect the true nature of exploitation and the images of children reflected in them. As such CSAM more accurately reflects these materials and this complaint shall use the phrase CSAM.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

4. All predators must identify vulnerable individuals that could become their potential victims. Once a victim, or a pool of victims is identified, the predator must find a way to recruit, lure, entice, and corral those victims into their web so that the predator might snare them for his illicit purpose.

5. Part of ensnaring a victim is a process called grooming.

6. "Grooming" is a deceptive process, enacted by a would-be abuser, in which the perpetrator selects a victim, gains access to and isolates the victim, develops trust and/or dependency in the victim's mind, and desensitizes the victim to sexual content and physical contact.[2]

7. A sophisticated predator is skilled at creating confusion, deception, and doubt, but simultaneously gaining trust, acceptance and affection or love from the victim. A predator will charm others and convince the responsible adults around their victim (or intended victim) that nothing is amiss or should be concerning.[3]

8. James Jackson, also known by his internet persona, "Onision," ("Onision") created a channel on Google's YouTube platform in 2006 and began posting to it in October of 2007.

8. YouTube is an online global video sharing and social media platform.

9. YouTube is the second most visited website, only second to Google search.

10. YouTube has more than 2.5 billion users monthly, making YouTube one of the largest social media companies in the world.[4]

---

[2] Elizabeth Jeglic, Ph.D. and Cynthia Calkins, Ph.D., *Protecting Your Child from Sexual Abuse: What You Need to Know to Keep Your Kids Safe* (Feb. 13, 2018).

[3] Malcolm Gladwell, *In Plain View, How Child Molesters Get Away with It*, The New Yorker (Sept. 17, 2012), available at https://www.newyorker.com/magazine/2012/09/24/in-plain-view.

[4] Dixon, S., *Most popular social networks worldwide as of January 2022, ranked by number of monthly active users*, Statista (July 26, 2022), available at https://www.statista.com/ statistics/272014/global-social-networks-ranked-by-number-of-users/.

11. YouTube has an unprecedented social impact and has influenced popular culture, internet trends, and has allowed the rapid spread of video media worldwide at the click of a button.

12. Certain YouTuber's rose in popularity quickly and gained celebrity status amongst their viewers.

13. Onision quickly became known quickly for his following and began creating and posting videos to YouTube. He rapidly became widely known for his commentary, some of which was objectifying, offensive, and controversial.

14. At his peak, Onision had over 2 million subscribers.

15. Onision targeted underage girls online and provided material that appealed to that age group, such as comments on body image, appearance, self-identity, suicide ideology, and similar topics. Onision would also rate and comment on pictures of people and their bodies, often sent to him by young teen girls.

16. Specifically, Onision appealed to minor females, like Plaintiffs, who were young, vulnerable, questioning their self-image or identity, or were seeking answers and guidance.

17. YouTube's product and non-neutral algorithm specifically targeted minors with these interests and suggested Onision's harmful and controversial content to minor teen users.

18. In 2009, Onision gained huge popularity online after his release of the "Banana Song," which went viral with over 90 million views, and was featured on national television in 2010.

19. At the same time, Onision's popularity was attributable to his commentary and skits portraying other YouTubers.

20. Onision became a famous and popular YouTuber on the platform and became monetized.

21.    When a person becomes monetized, YouTube and that person sign a YouTube Partner Program (YPP) contract, which forms an agency and/or profit-sharing relationship.

22.    Joining the YPP is optional, but if someone becomes a YouTube Partner, Google handles all the advertising placement, revenue collection, and pays the YouTube partner their portion of the profits, pursuant to the contract signed.[5]

23.    As a member of the program, Google "matches [the YouTube Partner's] videos with advertisers, decides what ads will appear, and keeps track of all traffic (views), as well as ad responses. YouTube then pays [the YouTube Partner] accordingly for [their] participation in the Partner program."[6]

24.    YouTube Partners agree to follow and abide by the YouTube Terms of Service and Community Guidelines.

25.    A YouTube Partner that fails to comply with the YouTube Terms of Service and Community Guidelines can be demonetized or have their video removed, among other penalties.

26.    Onision ran several YouTube channels, to include but not limited to Onision, OnisionSpeaks, UhOhBro, OnisionEncore, OnisionArchive, Laineybot, and CoolGuyKai.

27.    Upon information and belief, all of these channels were monetized under the YPP.

28.    Onision used his fame and platform to objectify children, to form relationships with underage girls, to entice them, groom them, and to arrange transportation across state lines and facilitate further grooming and sexual activity.

---

[5] Rich, Jason, *How to Become A YouTube Partner*, Entrepreneur (Dec. 19, 2013), available at https://www.entrepreneur.com/science-technology/how-to-become-a-youtube-partner/229919.
[6] *Id.*

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

29.    Onision began pursuing 17-year-old Taylor Anderson ("Lainey" or "Kai"), who went by the internet persona of "Laineybot." Taylor legally changed her name several times and currently goes by the legal name, Lucas Jackson.

30.    In November of 2012, Lainey and Onision got married.

31.    After Onision introduced Lainey to his followers, Lainey instantly became a part of the Onision channel and gained fame through her marriage.

32.    Lainey began flirting with and grooming underage girls that were fans of Onision through the YouTube platform, including but not limited to the Onision channels and forums.

33.    Those same girls were then invited to Lainey and Onision's home with the intent to engage in sexual acts and three-way sexual encounters with the couple, or for additional grooming to achieve the ultimate goal of sexual conquest by Lainey and/or Onision.

34.    YouTube was put on notice many times that Onision was violating the YouTube Terms of Service and Community Guidelines, but YouTube took no action to deter or demonetize Onision based on the numerous complaints or violative content he posted.

35.    YouTube was receiving value and profit-sharing with Onision on violent and harmful content, as well as content used to lure, entice, and recruit underage girls.

36.    YouTube continued to allow their partner, Onision, to post his content, which in turn recruited, lured and enticed Regina and Sarah to reach out to Lainey through the Onision forums.

37.    Regina and Sarah came to know who Lainey was by watching the Onision channels and saw her as a celebrity because she was married to Onision.

38.    Lainey later befriended Regina and 14-year-old Sarah online.

6

39.    After flirting with and grooming Regina from age 14 through 17 years old Lainey invited Regina to visit her and Onision at their home in Washington State.

40.    Regina attempted to go, but her mother refused to allow her to travel.

41.    After notifying Lainey that she was not able to go, Lainey quickly began replacing her with the next victim – a girl named Sarah.

42.    Lainey used Regina, unbeknownst to her, to gain trust with Sarah as well.

43.    After flirting with and grooming Sarah for two years, Lainey and Onision invited Sarah to visit them at their home in Washington State.

44.    Over the next few years, Sarah visited several times on or about the following dates:

| Visit No. | Dates of Travel | Sarah's Age | Lainey's Age | Onision's Age |
|---|---|---|---|---|
| 1 | 9/15/2016 – 9/20/2016 | 16 | 21 | 30 |
| 2 | 10/26/2016 – 2/21/2017 | 16 | 22 | 30-31 |
| 3 | 4/5/2017 – 4/13/2017 | 16 | 22 | 31 |
| 4 | 8/1/2017 – 11/7/2017 | 16-17 | 22-23 | 31 |
| 5 | 7/4/2018 – 8/25/2018 | 17-18 | 23 | 32 |
| 6 | 12/12/2018 – 12/29/2018 | 18 | 24 | 33 |
| 7 | 1/16/2019 – 1/20/2019 | 18 | 24 | 33 |
| 8 | 2/16/2019 – 2/20/2019 | 18 | 24 | 33 |
| 9 | 6/30/2019 – 7/8/2019 | 18 | 24 | 33 |
| 10 | 7/17/2019 – 7/23/2019 | 18 | 24 | 33 |

45.    During these visits, Onision and Lainey groomed Sarah, a minor child and Sarah's guardians, by constantly exposing her to:

a)  Sexual commentary,

b)  Sexual jokes,

c)  Physically touching her legs, buttocks, breasts, and body,

d)  Comments about the way her body looked,

7

e) Discussions about "being together" or "running away together,"

f) Vacillation in the way she was treated to create fear, anxiety, uncertainty, and a desire to please,

g) Exposure to sex acts with other partners, and

h) A perpetually sexually charged environment.

46.    After years of being groomed and sexualized by her guardians, Sarah was raped by Onision at the age of eighteen (18).

47.    After violating her, Onision fell into a pattern of victim shaming, in which he has published statements claiming that Sarah raped him and that she is a felon.  Both of these statements are untrue.

## PARTIES

**A. Plaintiffs.**

48.    Regina Alonso ("Regina") is a United States citizen that resides in Florida.

49.    Regina was a minor for the majority of the time that she was sex trafficked and became an adult prior to the filing of this action.

50.    Sarah is a United States citizen that resides in Michigan.

51.    Sarah was a minor for the majority of the time that she was sex trafficked.  She became an adult in the latter portion of being sex trafficked and was raped and defamed as an adult. As such, Sarah became an adult prior to the filing of this action.

52.    Because Defendants' victimization of Sarah is part of sex trafficking conspiracy, Sarah reasonably fear retaliation from Onision and stalking or harassment from other members of the online community, as many of Onisions's fans have targeted others women that were opposed to Onision.

53.    Sarah's safety, right to privacy, and personal security outweigh the public interest in knowing her identification.

54. Any public comments Sarah has made have only been done with her first name and not her last.

55. It is in the public's interest to give anonymity to sexual abuse and sex trafficking survivors so that other victims will feel the ability to come forward and not be fearful that their identity will be publicized.

56. Sarah's legitimate concerns for privacy outweigh any prejudice to Defendants or the public by allowing Plaintiff to proceed anonymously.

**B. Defendants.**

57. Defendant James Jackson is a resident of the State of Washington and is *sui juris*. Jackson is also known by his online persona "Onision," and before he changed his name, his name was Gregory James Jackson.

58. Defendant Lucas Jackson is a resident of the State of Washington and is *sui juris*. Lucas Jackson was formerly known by her online personas as "Laineybot," "Lainey," and "Kai," and before he changed his name multiple times, his former names included Kai Jackson, Taylor Anderson, and Taylor Avaroe.

59. Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountainview, California.

60. Defendant YouTube LLC is a Delaware limited liability corporation with its principal place of business in Mountainview, California.

61. Since 2006, Google has operated YouTube.

62. Defendants Google and YouTube are referred to jointly as "YouTube" or the "YouTube Defendants."

63. At all relevant times, YouTube designed, maintained, manufactured, marketed, advertised, promoted, owned, operated and distributed the social media platform YouTube.

9

**JURISDICTION AND VENUE**

64.     This Court has federal question subject-matter jurisdiction, pursuant to 28 U.S.C. § 1331, because Plaintiffs bring this action under 18 U.S.C. §§ 2255 and 1595.

65.     This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties have complete diversity, insofar as Plaintiffs are residents of Florida and Michigan, Defendants Onision and Lainey are Washington residents, and Defendant YouTube has its principal place of business in California.

66.     This Court has personal jurisdiction over the Defendants because they have committed the acts complained of herein in this State and in this District.

67.     Defendants have significant contacts with the Northern District of California such that they are subject to the personal jurisdiction of the Court.

68.     This Court has personal jurisdiction over the YouTube Defendants for the additional reason that they have engaged in substantial, systematic and continuous contacts with this State by, inter alia, regularly conducting and soliciting business in this State and this District, deriving substantial revenue from products and/or services provided to persons in this State and this District, and in some circumstance, from products and services provided from persons in this State.

69.     Defendants have significant contacts in each of the States and Territories of the United States, such that personal jurisdiction would be proper in any of them.

70.     Pursuant to transfer order (ECF No. 88) in the Western District of Michigan, Case No. 1:23-cv-223, and transfer order (ECF No. 66) in the Middle District of Florida, Case No.: 5:23-cv-91, these actions were transferred to the Northern District of California, San Jose Division.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

71.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because all the other claims are related to the claims with original jurisdiction and form part of the same case or controversy.

72.    Venue is proper in this district pursuant to 28 U.S.C. §1391 pursuant to Defendant's Terms of Service Agreement.

## FACTUAL ALLEGATIONS

### GOOGLE'S YOUTUBE PLATFORM, BUSINESS MODEL, AND CONTENT MODERATION POLICIES AND PRACTICES

73.    YouTube is an online global video sharing and social media platform and was the second most visited website in the world in 2022, only second to Google search.

74.    YouTube has more than 2.5 billion users monthly, making YouTube one of the largest social media companies in the world.[7]

75.    You Tube has an unprecedented social impact and has influenced popular culture, internet trends, and has allowed the rapid spread of video media worldwide at the click of a button.

76.    In 2010, the concept of the "YouTuber" became a national phenomenon in which the possibility of achieving celebrity status went from being for a few to being possible for anyone that had access to the Internet.

77.    Much of the activity on YouTube has been monetized, and YouTube and Google use most of the data and information YouTube has learned about its users and videos to raise revenue and drive profits.[8]

---

[7] Dixon, S., *Most popular social networks worldwide as of January 2022, ranked by number of monthly active users*, Statista (July 26, 2022), available at https://www.statista.com/ statistics/272014 /global-social-networks-ranked-by-number-of-users/.

[8] Bergen, Mark, *Like, Comment, Subscribe: Inside YouTube's Chaotic Rise to World Domination* (2022); Nilay Patel, *Everyone knows what YouTube is—few know how it*

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

78. Google monetizes its YouTube platform through both advertising revenue, as well as non-advertising. Advertising revenue is derived from YouTube ads and revenue generated on YouTube properties. Non-advertising revenue is derived through the sale of YouTube Premium and YouTube TV subscription services.[9]

79. YouTube, which saw approximately $20 billion in profits in 2020 and approximately $28 billion in 2021, accumulates a massive amount of revenue from its advertising.[10]

80. Between March 2020 and February 2021, YouTube's top 10 advertisers spent over $1 billion.[11]

81. In order to increase advertising revenue, YouTube has created a platform which allowed any person that wants to create content on YouTube to have the ability to achieve fame, popularity, and monetization if they meet the eligibility criteria to join the YouTube Partnership Program ("YPP").

82. The eligibility requirements of the YPP require that the applicant obtain 1000 subscribers with 4000 valid public watch hours in a 12-month period of time. Once eligibility is achieved, YouTube will review the channel to determine if

*really works*, The Verge (Sept. 13, 2022), available at https://www.theverge.com/ 2022/9/13/23349037/mark-bergen-youtube-creators-tiktok-algorithm; Kevin Lozano, *How YouTube Created The Attention Economy,* The New Yorker (Oct. 4, 2022), available at https://www.newyorker.com/books/under-review/the-overlookedtitan-of-social-media.

[9] Alphabet Inc. Form 10-K for Fiscal Year Ended December 31, 2021. Securities and Exchange Commission, 2021, https://abc.xyz/investor/static/pdf/20220202_ alphabet_10K.pdf.

[10] Graham, Megan, et al., *How Google's $150 billion advertising business works*, CNBC (Oct. 13, 2021), available at https://www.cnbc.com/2021/05/18/how-does-google-make-moneyadvertising-business-breakdown-.html; Id.

[11] Statista, *Leading YouTube advertisers in the United States between March 2020 and February 2021 by advertising spending* (May 31, 2022), available at https://www. statista.com/statistics/1112288/us-youtube-advertisers-ranked-by-ad-spend/.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

it conforms with the Community Guidelines, and then allow the user to become monetized.[12]

83.    The YPP applicant signs a contract with YouTube in which they become a Program Partner ("YouTube Partner") and YouTube agrees to profit share with the YouTube Partner.  For advertising revenue, YouTube pays the YouTube Partner 55% of advertising revenue from their page, and YouTube keeps 45% of the advertising revenue.[13]

84.    Joining the YPP is optional, but if someone becomes a YouTube Partner, Google handles all the advertising placement, revenue collection, and pays the YouTube partner their portion of the profits, pursuant to the contract signed.[14]

85.    As a member of the YPP, Google "matches your videos with advertisers, decides what ads will appear, and keeps track of all traffic (views), as well as ad responses. YouTube then pays you accordingly for your participation in the Partner program."[15]

86.    YouTube offers their YouTube Partner special tools to improve and further monetize their page.

87.    YouTube Partners agree to follow and abide by the YouTube Terms of Service and Community Guidelines.

---

[12] YouTube Help, *YouTube Partner Program overview & eligibility*, (last viewed January 16, 2023), available at https://support.google.com/youtube/answer/72851?hl=en#zippy=%2Cwhat-happens-if-my-counts-drop-below-the-threshold-after-i-apply%2Cim-no-longer-in-ypp-or-i-was-never-in-the-program-and-im-seeing-ads-on-my-videos-am-i-earning-revenue-from-those-ads.

[13] *Id.*

[14] Rich, Jason, *How to Become A YouTube Partner*, Entrepreneur (Dec. 19, 2013), available at https://www.entrepreneur.com/science-technology/how-to-become-a-youtube-partner/229919.

[15] *Id.*

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

88.     A YouTube Partner that fails to comply with the YouTube Terms of Service and Community Guidelines can be demonetized or have their video removed, among other penalties.

89.     YouTube also "recommends" content through their algorithm.  Not all videos are recommended; rather, the YouTube algorithm seeks to prioritize videos with high watch time and video performance.[16]

90.     Google is, in part, an advertising broker, selling attention to companies that will pay for it, and the longer people stay on YouTube or access its recommended content, the more money YouTube and its parent companies make.

91.     Google has the ability to, and in fact has, demonetized some of its YouTube Partners in the past for violating the YouTube Terms of Service and Community Guidelines.

92.     Platforms like YouTube have learned that outrageous, tortious, and divisive content drives users and profits.

93.     YouTube's recommendation system is responsible for generating the majority of all user viewing time on the platform and much of the most interacted with materials involve controversial, intense, violent, and extreme views.[17]

94.     Defendant YouTube pays its YouTube Partners to create content because it benefits from increased user activity, which in turn increases advertising revenue, and other promotional revenue sources.

[16] Sweatt, Lydia, *YouTube Algorithm Guide: How Your Videos Are Recommended to Viewers,* VidIQ (Apr. 20, 2021), available at https://vidiq.com/blog/post/how-youtube-algorithm-recommends-videos/?utm_source=google&utm_medium=cpc &utm_ campaign= 17815400597__s-pmax-en-us-top_&utm_content=&utm_term= &a=1103&source= 17815400597__s-pmax-en-us-top_&aff_sub=google&aff_sub2= cpc&aff_sub3=&aff_ sub4=&afmc=1yc&gclid=Cj0KCQiAiJSeBhCCARIsAHnAzT_DD _4_1wK-i8NzIIcn9-1yqusnbQbD2C2x0PHXlnjVE2fJAVUXKuMaAt9nEALw_ wcB.

[17] Zeynep Tufekci, *YouTube, the Great Radicalizer*, N.Y. Times (Mar. 10, 2018), at 6, available at https://www.nytimes.com/2018/03/10/opinion/sunday/youtube-politics-radical.html.

95.    A former Google executive was quoted in the Wall Street Journal saying: "There's this idea that the search algorithm is all neutral and goes out and combs the web and comes back and shows what it found, and that's total BS."[18]

96.    More than 70% of the videos watched on YouTube are videos recommended by YouTube's non-neutral algorithm in an effort to drive user engagement and therefore advertising profits.[19]

97.    YouTube allows YouTube Partners to monetize their platforms on its product to generate revenue for itself and its users, including YouTube Partners that violate the Community Guidelines and laws prohibiting the sexual exploitation of children.

98.    YouTube's product was built to promote hateful, harmful, and controversial content as it is the most engaging to users, including its minor users.[20]

99.    It is well established under the law that children lack the legal or mental capacity to make informed decisions about their own well-being.[21]

100.    YouTube in turn pays its YouTube Partners a range of $0.50 to $6 USD per 1,000 views on any video, including materials depicting minors in violation of sex trafficking and child pornography laws, as well as other criminal statutes.[22]

---

[18] Grind, Kristen, et al, *How Google Interferes with Its Search Algorithms and Changes Your Results*, Wall Street J. (Nov. 15, 2019), available at https://www.wsj.com/articles/how-google-interferes-with-its-search-algorithms-and-changes-your-results11573823753.

[19] E.g., M. Faddoul et al., *A Longitudinal Analysis of YouTube's Promotion of Conspiracy Videos*, arXiv: 2003.03318 (Mar. 6, 2020), available at https://arxiv.org/abs/2003.03318.

[20] Lewis, Paul, *Fiction is Outperforming Reality: How YouTube's Algorithm Distorts Truth*, The Guardian (Feb. 2, 2018), available at https://www.theguardian.com/technology/2018/ feb/02/howyoutubes-algorithm-distorts-truth.

[21] Bergen, Mark, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant,* Bloomberg (Apr. 2, 2019), https://www.bloomberg.com/news/features/2019-04-02/youtube- executives-ignored-warnings-letting-toxic-videos-run-rampant.

[22] *See* YouTube, *How YouTube creators earn money - how YouTube works*, YouTube, (last visited Dec 1, 2022), https://www.youtube.com/howyoutubeworks/product-

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

101.    YouTube has employed a tiered revenue-sharing governance. Non-monetized general users of the platform were being given far more freedom than YouTube Partners, who were bound by their YPP Agreement and were required to ensure their content was "advertiser-friendly."[23]  After all, the very purpose of the YPP was to increase profits from YouTube advertising by employing the content producers that were valuable to YouTube and had the potential to increase their revenue.

102.    Some YouTube Partners have used their YouTube platform, in a profit-sharing partnership with YouTube, to facilitate sex trafficking and build a pool of children from which to select and groom their next victim from within.

103.    One such YouTube Partner was Onision.

104.    The YouTube Defendants provided Onision with a platform and materially contributed to his channels. The YouTube Defendants further engaged in "creation and development" of Onision's channels. YouTube is liable to Plaintiffs for its own actions in the "creation or development in whole or in part" of Onision's channels. 47 U.S.C. § 230(f)(3). YouTube materially contributed to the "creation and development" of Onision's channel.

105.    In or about 2012 the YouTube Defendants launched their "Trusted Flagger" program, and in doing so they defectively designed a product that they knew or should have known to be harmful to users such as Plaintiffs. Due to the decisions made by the YouTube Defendants in creating, designing, and implementing the "Trusted Flagger" Program, Onison's sexual exploitation, grooming, and abuse of Plaintiffs as well as other minor girls continued for years.

---

features/monetization/#:~:text=Monetization%20for%20Creators,Overview&amp;text=YouTube%20Creators%20are%20individuals%20who,%2C%20merchandise%20sales%2C%20and%20subscriptions.

[23] Caplan, Robyn and Tarleton Gillespie, *Tiered Governance and Demonetization: The Shifting Terms of Labor and Compensation in the Platform Economy*, Sage Publishing (April-June 2020), available at https://journals.sagepub.com/doi/pdf/10.1177/ 2056305120936636.

106. In or about 2016, the YouTube Defendants recognized many of the defects within their "Trusted Flagger" program. The YouTube Defendants then designed, developed, produced, and implemented their "Heros" program which the YouTube Defendants designed to give certain individuals special access to better mark trusted or problematic channels.

107. Due to the failures and defects within the "Heros" program effectively designated and ratified Onision's channel as trusted, Plaintiffs faced foreseeable and preventable abuse from their use of the YouTube product. These harms occurred and continue to occur despite several public reports to YouTube and its "Heros" that Onision maintained a problematic channel that harmed young girls like the Plaintiffs.

108. On or around 2018, the YouTube Defendants then their "Trusted Flagger" program. During this time, the YouTube Defendants' designed their product in such a way that failed to protect minor girls like Plaintiffs from sexual exploitation and abuse by their very own YouTube Paid Partners like Onision on channels designed by YouTube.

109. To the present day, Onision's channel containing significant material depicting the sexual exploitation, grooming, and abuse of Plaintiffs remains on YouTube. YouTube failed to adequately report any such channels to the National Center for Missing and Exploited Children or appropriate authorities.

110. Indeed, at least until on or after January 21, 2021, YouTube continued to profit off Onision's channel while the YouTube product continued to ratify, approve, "trust," and materially alter Onision's abuse of Plaintiffs on their platform.

111. The YouTube Defendants designed their product such that reports that prolific and profitable Paid Partners such as Onision committed child exploitation or abuse were not deemed "trusted" and "hero" approved while Onision's channel including his abuse of Plaintiffs were deemed "trusted" and "hero" approved.

112. The YouTube Defendants designed their product to prevent and discourage public reports of child exploitation and abuse by prolific and profitable

Paid Partners such as Onision. In order for any YouTube to make any such report they must first log in to their platform and then submit a series of questions. This problematic design is at odds with YouTube's reporting requirements under various federal laws. This problematic design is defective, unsafe, and harmful to minor girls like Plaintiffs.

113.   YouTube actively monitors where it appears in the news and sends a daily email to its employees detailing this coverage.  This has been referred to by the moniker, "The Nightmare Fuel."

## THE RISE OF ONISION TO BECOME ONE OF YOUTUBE'S MOST INFLUENTIAL PERSONAS ONLINE, ALONG WITH HIS SPOUSE, LAINEY

114.   On January 29, 2006, Onision started a YouTube channel and began posting to it on October 17, 2007.

115.   Onision became known quickly for his content and began creating and posting videos to YouTube. He quickly became known for his commentary, some of which was humorous, and some of which was objectifying, offensive, and controversial.

116.   Onision targeted underage girls and provided content that appealed to that age group, such as comments on body image, appearance, self-identity, suicide ideology, and similar topics. Onision would also rate and comment on pictures of people and their bodies, often sent to him by young teen girls.

117.   Despite push back from the online community about Onision's damaging and negative commentary to young teen girls, he rebuffed it by claiming he was being "honest."

118.   He also posted content that he claimed was comedy, but was actually a smear campaign against his ex-girlfriends and an effort to publicly humiliate them.

119.   On August 5, 2005, Onision married his first wife, Skye Jackson ("Skye").

120.   Upon information and belief, shortly after their marriage, Onision began to isolate Skye and prevent her from associating with friends and family.

121.   Onision produced several online videos with Skye, some on YouTube and some on other websites.

122.   In 2009, Onision was discharged from the Air Force. It was after his discharge that he began seriously pursuing a YouTube career.

123.   In 2009, Onision hit ultimate popularity online with his release of the Banana Song, which went viral with over 90 million views, and was featured on Comedy Central series Tosh.O in 2010.[24] Skye participated in this video.

124.   Onision targeted minor audiences on YouTube and specifically targeted minors with emotional vulnerabilities and pre-existing traumatic experiences such as eating disorders, suicidal ideations, mental health disorders, and more.

125.   At the same time, Onision rose in popularity because he was commenting on and doing skits portraying other YouTuber's, including popular YouTuber, Shane Dawson.

126.   In 2010, Onision and Skye divorced.

127.   As Onision's popularity grew, he gained enough popularity that he was able to participate in YouTube's Partnership Agreement, which allows a YouTuber that has gained a certain number of followers to monetize their platform and make money from the content that is posted.

128.   As of the filing of this lawsuit, Onision has been in the Partnership Program for approximately a decade and has monetized his videos during this time period and all relevant time periods.

---

[24] *Onision, Banana Song (I'm a Banana)* (Sept. 25, 2009), https://www.imdb.com/title/tt7030624; Tosh.O, Comedy Central, *This Week's Viewer Video: I'm a Banana* (Feb. 4, 2010), http://tosh.comedycentral.com/blog/2010/02/04/this-weeks-viewer-video-im-a-banana.https://web.archive.org/web/20130317023036/http:/tosh.comedycentral.com/blog/2010/02/04/this-weeks-viewer-video-im-a-banana/

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

129. During his tenure as a member of YouTube's Paid Partnership Program, Onision posted videos and other content specifically targeting teen users and their insecurities—with certain video titles tailored to teenage concerns, including:

*"Am I Pretty?;*

*Am I Ugly or Not?;*

*Should People Shave Their Legs (and Arms and "Down There");*

*How to Flirt With Guys;*

*How to Tell if You're Circumcised;*

*How to Ask Someone to Date You;*

*How Skinny is Too Skinny?;*

*How to Give a Hickey."*

130. The internet community began to take issue with Onision's content as early as 2012.

131. In January of 2012, Onision published a video about one of his ex-girlfriends in which he stated that because she had slept with more than 20 people before him, she was a "slut" who cannot be raped.[25]

132. As a result of this video, numerous people asked YouTube revoke his YPP Agreement.

133. Shortly after this occurred, viewers signed a Change.org Petition to demonetize Onision which was sent to YouTube.

134. Many viewers reported Onision's accounts to AdSense, which is a Google program that matches ads to the individual YouTube website based on content and visitors and coordinates the advertising makeup that allows for the monetization of a YouTube Partner's website. Since it is a Google program, a report to AdSense is effectively a report to Google.

---

[25] Eordogh, Fruzsina, *YouTuber inflames viewers with rape comments*, The Daily Dot (Jan. 25, 2012), available at https://www.dailydot.com/unclick/onision-rape-vidcon-haters-youtube-banned/.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

135. One reporter in particular specifically flagged for Google that not only was this video harmful, but stated amongst other comments about Onision:

> ". . . I'm disgusted by his recent videos and, despite his attempt at an apology, I do not believe he is actually sorry, or actually will change his behavior in the future. It seems to me that this is part of a cycle of his, where he makes several videos that deeply offend a percentage of his fans and viewers, he receives a backlash by those affected by his judgmental comments, he rants about them and dismisses them as "haters," and then he finally apologises to save face and tries to cover it up by deleting the videos. Only the damage is already done, it's far too late for an apology. His young, impressionable followers have already swallowed his opinions whole and committed to them as gospel. It is also a very cheap way to rack up views and collect ad revenue.
>
> Sponsoring these videos is condoning his destructive behaviors. I can't imagine that you, or the companies that advertise with you, support such opinions. Revoking his sponsorship will send the message that you do not take this lightly, and that you respect the people who are watching the ads that you attach to these videos . . ."[26]

136. Many viewers flagged the offensive video online through YouTube.

137. Viewers wrote to VidCon, an upcoming convention at which Onision was scheduled to speak at.

138. YouTube took no action and did nothing to enforce their Terms of Service and Community Guidelines or force Onision to stop posting content that violated these guidelines.

139. Instead, YouTube continued to enable and reward Onision for his harmful and volatile content by allowing him to continue in the YouTube Partnership Program and profit-share with YouTube.

---

[26] "Money-Mud," *Stand Against Onision's Hateful Behavior*, Tumblr (Jan. 2012), available at https://money-mud.tumblr.com/post/16044152816/amp.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

140.   On January 20, 2012, VidCon acted differently however, and responded to the communication received by removing Onision as a speaker at VidCon and banning him from attending.  Onision responded on social media acknowledging this:



141.   Despite all of this, Onision's YouTube partnership remained intact, YouTube took no action, and Onision's content escalated.  He continued to use his channel to lure and entice young, vulnerable teenagers and then groomed them with his messaging.

*Onision Formed his partnership with Lainey,[27] who Assisted in His Grooming and Recruitment of Underage Girls.*

142.   When Lainey was an underage girl, she began fangirl messaging Onision for several months.

143.   On February 12, 2012, Lainey, who at the time was a minor child named Taylor, used the online screenname of "Lainey" or "Laineybot."

144.   Lainey and Onision connected online.  Here is one such example of how they connected:



---

[27] Pronouns will be used based on the timing of what is discussed. In 2012, Lainey identified as a female and female pronouns will be used when discussing that time frame. In 2019, Lainey changed genders to identify as male, and male pronouns will be used when discussing events after that time period.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

145. While Lainey was still 17 years old, Lainey and Onision began a romantic relationship.

146. On November 14, 2012, Lainey and Onision got married.

147. Onision and Lainey began working together to groom and lure underage girls through Onision's YouTube online platforms, channels, and forums.

148. Onision's YouTube channels gave him the fame, platform, and megaphone to reach countless people. The content he discussed attracted young teenage girls.

149. As his wife, Lainey became a part of the Onision story and gained popularity and attraction by many of Onision's followers.

*Onision Forums Promoted and Enabled Predatory Behavior*

150. Onision created Onision Forums that he promoted in every, or almost every, video posted to his YouTube channels.

151. In his videos on his monetized platform, Onision invited his extremely young follower-base to message him on his forums.

152. In some videos, Onision invited the same follower-base to submit photos of their bodies for him to "rate" through the Onision forums.

153. Onision would then comment on what was said to him and the young teen body videos on his YouTube channel.

154. Pursuant to the terms of the YPP, YouTube would profit-share with Onision for these videos.

155. The Onision Forums were overseen by Onision and Lainey. Any moderators on the forums answered to Onision and/or Lainey who ultimately controlled the tone and what was permissible on the forums.

156. Minors and impressionable young teens were the primary age group that were drawn to Onision's YouTube channels.

157. Lainey's presence in Onision's life became a major draw for their young fan base as well. In fact, many Onision fans became far more invested when Lainey joined Onision's channel and his life.

158. Onision and Lainey published many forum topics, inviting their followers, including their child followers to respond, such as:

*"What age does Greg think you are?*

*Rate me from 1 to 10*

*Would Laineybot date you?*

*Hot or not, Laineybot chooses.*

*Marry, \*\*\*\*, or kill*

*Are your boobs actually too big/small?*

*What is Onision's Opinion on you?*

*Would you date me?*

*Makeup or no makeup*

*Hot or not*

*Show off your Body Abnormalities*

*What does Lainey think about your body?"*

159. Young people, including minors, would join the forums in the hopes that Onision and/or Lainey would communicate with them, which they sometimes did.

160. Moderators were selected to operate as volunteers and oversee the forums.

161. Some of the moderators were children themselves.

162. These volunteer moderators answered to Onision and/or Lainey and Onision and/or Lainey controlled the content and what or who was ultimately banned or removed.

163. The volunteer moderators never received training or genuine guidance on how to properly moderate the forums to prevent predators from communicating

24

with the minor children on the forums, what grooming looks like, and other policies to keep the forums safe.

164.    The Onision Forums had no specific rules or terms of conduct and the forum operated like the wild west.  If any rules did exist, they were not enforced.

165.    Onision turned around and commented on what was said in the forums in his YouTube videos.

166.    Onision's acknowledgement of commentary from his fans in his YouTube videos caused his fans to be more eager to send him content and reach out.  This further increased his reach within his pool of victims.

*Lainey Groomed, Lured, and Recruited Regina*

167.    In 2012, a young child named Regina[28] was twelve (12) years old, was depressed, and googled "How to Kill Yourself." Regina found Onision's video that shamed anyone that wanted to kill themselves and found connection.

168.    Regina began to watch many of Onision's videos and felt a deep connection.  She became a huge fan.

169.    Under her username handle, Regina developed online relationships and friendships with other YouTubers as her community of support.

170.    On September 28, 2012, 14-year-old Regina (hahag0away @beaut1ful_paradise_) began speaking with Lainey (coolguykai @laineybot) through Instagram and was starstruck, as depicted below:

---

[28] Regina uses non-binary pronouns of "they/their/them." In an effort to be clear that Regina is being referenced as a singular person instead of in the plural context, singular female pronouns will be used in this document. This is intended to achieve precise clarity, to avoid confusion, and is done with Regina's consent.

171. Regina turned 15-years-old approximately one month after meeting Lainey.

172. Regina initially told Lainey she was nineteen (19) years old, but quickly clarified that the real age was fifteen (15) years old. Lainey was not deterred from sexually pursuing Regina upon finding out her real age.

173. Regina and Lainey went from speaking occasionally to speaking daily and Regina soon considered Lainey to be a best friend based on the level of sharing and intimacy between the two.

174. Lainey continued to flirt, groom, and condition Regina when she was 15-17 years old.

175. Lainey frequently had highly sexualized conversations with Regina.

176. When the opportunity arose, Regina became a volunteer forum moderator for the Onision Forums.

177. At this time, Regina was a young teen herself and was not old enough to fully understand the boundaries of what was appropriate for the forums.

178. Regina received no training on how to be a moderator.

179. Regina became a volunteer moderator for Lainey's own forums as well and became the moderator for all of Lainey's social media.

180.    Regina admired Lainey and formed an emotional and sexual attraction to her.

181.    While 16-years-old, Regina confided in Lainey that she was bisexual and was questioning her gender.

182.    Lainey encouraged this conversation and stated that she liked girls too, leading Regina to believe that being with Lainey in a romantic way was an option.

183.    In the summer of 2015, Lainey came out officially as "bi-sexual."

184.    Around the same time, Onision made it publicly known on YouTube that he was agreeable to Lainey having a relationship with another girl and the couple began posting YouTube videos advertising the same.

185.    Upon information and belief, Onision encouraged and enticed Lainey to enter into a relationship with another girl.

186.    Onision and Lainey began publicly talking about having a polyamorous relationship with other girls.

187.    Although it was presented to the world as an opportunity for Lainey to be with a woman, in reality, this was done so that Onision could engage in threesome sex acts with other girls and used Lainey as the bait to lure them in.

188.    Onision has stated that he will not allow Lainey to engage in sex acts with a girl that he does not engage in sex acts with the same person.

189.    Despite being married and an adult, Lainey began dating underage Regina.

190.    Regina had just turned 17-years-old only eight days before the "dating" announcement:



*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

191. During this "relationship," Lainey groomed underage Regina with flirtatious and suggestive comments, such as "I love you," sexual commentary, and sent nude photos. Some examples of such communications were as follows:





192. Lainey also sent Regina "thirst traps," which is an internet phrase for lewd photos depicting Lainey in her bra and underwear, or a lowcut shirt, and were supposed to leave the viewer "thirsty for more" due to the sexual inuendo contained in the photo(s).

193. Lainey frequently requested that Regina send the same nude and "thirst trap" photos back.

194. Lainey and Regina frequently had Skype calls. On one such Skype call, Lainey appeared on camera topless. This was done as a grooming tactic to desensitize Regina to sexuality and test her boundaries.

195. In addition to the "thirst trap" images sent by Lainey to Regina, Lainey also requested photographs of Regina.

196. In response to Lainey's demands, Regina sent an image of her exposed breasts to Lainey.

197. Separately, in response to Lainey's demands, Regina sent an image of her exposed buttocks to Lainey.

198. Lainey discussed sexuality with her, including sexual acts she wished to do with Regina, and expressed sexual and emotional desire for her.

199. In 2015, Lainey encouraged 17-year-old Regina to visit her and Onision together.

200. Lainey offered to pay all of Regina's travel expenses for the trip.

201. Lainey intended to lure, entice, recruit, and solicit Regina to their home so that she could join in sexual activity with Regina and in threesome sexual acts with Onision and Lainey together.

202. Further, upon information and belief, Lainey intended to lure Regina to their home so that Regina could be given to Onision so that he could engage in sexual acts with Regina.

203. Regina, being young and naïve, desperately wanted to visit Lainey, but Regina's mother would not let her travel.

204. When Lainey and Onision realized Regina could not visit them and feed Onision's sexual appetite, Regina was "replaced" with Sarah.

*Onision and Lainey Groomed, Lured, and Recruited Sarah at Same Time*

205. As a young girl, Sarah had a troubled home life and was both depressed and suicidal.

206. During this time, Sarah found Onision's channel on YouTube and was attracted to the topics, as they spoke about self-harm and self-image.

207. Sarah became a fan of the Onision Speaks channel, and in 2012, became even more of a fan when Lainey was introduced as Onision's significant other.

## AGE 13

208. At age 13, Sarah reached out to Onision and Lainey on their Twitter page via her own handle. Sarah began responding to the posted Tweets, to which Lainey would usually respond.

209. Around the same time, Sarah joined a Kik chat group for Lainey fans and became friends with Regina through this group.

210. Regina had been appointed the moderator of this group and Lainey had become very close with Regina at this point.

## AGE 14

211. In the grooming process, predators will use one victim to access other victims and to invoke loyalty and trust in their victims by making loyalty and trust extremely desirable traits that the perpetrator rarely gives out.

212. Lainey asked Regina about her friend, Sarah, and wanted to know if Sarah was "trustworthy." Regina "vouched" for Sarah.

213. In August of 2014, Lainey messaged Sarah on Twitter directly and asked her age. Sarah stated she was 14 years old, as shown below:



214. Shortly prior to this, Sarah and Lainey had recently started messaging on KIK and Lainey had told Sarah she found her "cute."

215. At this same time, Lainey was 19 years old, about to turn 20 years old.

216. Given Sarah's vulnerabilities, she embraced the positive attention she was receiving from Lainey and couldn't believe that a "famous" person cared about her and wanted to be her friend.

217. When Lainey and Sarah first began speaking, Lainey identified as a straight, married woman.

218. As a result, Sarah did not understand that she was being groomed by Lainey, as she believed sexual contact could never result from these conversations.

219. Throughout 2015, Sarah, Regina, and Lainey formed a strong friendship and began a group chat called "The Three Musketeers."

220. When grooming minors, many predators will talk about sex with their target to desensitize the child so that sexual commentary feels normal and common

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

place. Such desensitization allows the predator to more easily move to the next step in the grooming process.[29]

221. Lainey quickly turned this group chat into a flirtatious, sexual chat, and continued sending sexual commentary and photos to Regina and Sarah.

222. Lainey added a bear and a heart emoji next to Sarah's name in her own phone, as well as red lipstick next to Regina's name in her phone, showing how she views these two minor children:



223. Lainey shared explicit details of her sex life with Onision with both Regina and Sarah.

224. Because of the heavy sexual content in the conversations, the flirtations, the attention, and Regina's and Sarah's own vulnerabilities, 16-year-old Regina and 14-year-old Sarah began to have romantic feelings for Lainey.

225. Lainey discussed sexuality with her, to include sexual acts she wished to do with Sarah, and expressed sexual and emotional desire for her.

226. Given Sarah's childhood, she craved this type of attention and desire and fell prey to Lainey's trap.

227. Lainey encouraging other adults to message Sarah, a 14-year-old child:

---

[29] *Grooming: Know the Warning Signs,* RAINN (July 10, 2020), available at https://www.rainn.org/news/grooming-know-warning-signs.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT



228.   During this time, Sarah also began speaking to Onision in addition to Lainey.

229.   In January of 2015, Sarah changed her username to "Jailbait," acknowledging the ongoing sexual nature of the communications with herself as a minor child and the legal risks it posed to Lainey and Onision.

230.   As depicted, Jackson's commentary, inclusive of Onision, contained a sexual connotation, such as "INTO THE DUNGEON":



231.   In 2015, Lainey and Sarah were speaking romantically and would refer to each other as "girlfriends" on social media:



232.   Over the spring of 2015, Lainey tweeted Sarah and Regina many sexual and flirtatious comments, to include:



*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

**AGE 15**

233.   Sarah turned 15 years old on in August of 2015, making her 14 years old when she received these messages.

234.   After months of grooming and her own vulnerabilities, Sarah's young, undeveloped mind believed that she was "in love" with Lainey.

235.   In the summer of 2015, Lainey came out officially as "bi-sexual."

236.   Onision informed Lainey that she could have a "girlfriend."  The couple posted videos advertising the same.

237.   Shortly before Sarah turned 16 years old, Lainey and Onision invited Sarah to visit them at their home in Washington State.

238.   On or about September 9, 2016, Lainey posted online that Sarah was visiting her and Onision:



239.   When the online community objected and flagged how inappropriate this was, Lainey called Sarah. In that call, Lainey propositioned Sarah, telling her it was illegal for them to have sexual intercourse based on Sarah's age, but suggested they could just "kiss" or "make-out" instead.

**AGE 16**

240.   On September 15, 2016, one month after her 16th birthday, Sarah flew to Gig Harbor, Washington to visit Lainey and Onision.

241.   At this time, Onision was 30 years old, and Lainey was 21 years old.

242.   When grooming a child, predators will often attempt to gain a child's trust by talking, playing, and interacting with them in a way consistent with peers of

their own age (e.g. playing video games, talking about teen topics of conversation, etc.).[30]

243. While at Lainey and Onision's house, Sarah felt that she, Lainey, and Onision had a great time and it was an escape from the life she knew at home.

244. Onision invited Sarah to play video games for hours and interacted with her the way another 16-year-old would engage.

245. Onision told Sarah that she was "mature" for her age and it felt like "hanging out with a 20 year old."

246. Sarah's visit was short and on or about September 20, 2016, she returned to Michigan.

247. A few weeks after Sarah's first visit, Onision and Lainey invited Sarah to return for a second visit and invited her to live with them permanently due to problems she was having at home.

248. Sarah's mother allowed her to do this and signed a medical and financial power of attorney over to Lainey. Sarah's mother also awarded Lainey guardianship of Sarah.

249. Because of the financial power of attorney, Lainey had full and complete control over Sarah's bank account until she turned 18 years old.

250. On or about October 26, 2016, Sarah returned to Gig Harbor, Washington and moved in with Lainey and Onision.

251. Child predators often attempted to desensitize their victims to sexuality and sexual topics. Additionally, predators will also initiate gentle touching in safe areas that become more and more flirtatious. This is done as an introduction to facilitate future sexual contact as part of the grooming process.[31]

---

[30] *Keeping Kids Safe, How Child Sexual Predators Groom Children*, Michigan State University, (Nov. 15, 2020), available at https://www.canr.msu.edu/creating-safe-environments/uploads/files/Final%20-%20Grooming%20Children.pdf.

[31] *Grooming: Know the Warning Signs,* RAINN (July 10, 2020), available at https://www.rainn.org/news/grooming-know-warning-signs.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

252.   Soon after arriving, Onision began frequently making sexually charged jokes to Sarah, to include explicit references and jokes about sexual topics and sexual acts.

253.   The constant jokes effectively minimized the feeling that sex was taboo in the mind of Sarah at the time.

254.   Onision soon began touching Sarah in small, yet suggestive ways.

255.   During the first visit to their house, Onision touched Sarah's face and caressed her face in a sensual way.

256.   While living at their residence, Onision and Sarah were together wearing only shirts and underwear (not pants). While Lainey was showering, Onision deliberately pressed his erect penis up against Sarah's buttocks, making her feel uncomfortable.

257.   On yet another occasion, Onision was giving minor Sarah a back massage and began caressing and rubbing her buttocks in a sexual manner. He also reached around the front of her shirt and groped, fondled, and molested 16-year-old Sarah's breasts. Sarah felt extremely uncomfortable.

258.   The couple engaged in three-way wrestling matches with Sarah, causing many body parts, to include Sarah's breasts and buttocks, to be deliberately touched and grabbed by Onision and Lainey under the guise of "wrestling."

259.   Onision would find reasons to touch or brush up against Sarah's breasts, buttocks, or body and would cause his hand to linger, touching her continually until Sarah stepped back. This happened frequently, adding to the high sexual energy in the home.

260.   Throughout her time living with Onision and Lainey as a minor, Onision would touch her legs, would tickle her, would hand feed her food, and would constantly comment on her body in a sexual way.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

261. Onision and Lainey would frequently engage in sexual activity in a manner and at a volume so that Sarah could not avoid hearing or walking in on the act.

262. All of the touching and constant sexual commentary by Onision made Sarah uncomfortable, but she felt powerless to act.

263. Lainey, on the other hand, frequently made Sarah feel as though they might be further romantically involved in the future.

264. Lainey asked Sarah that if she and Onision ever got divorced, could Sarah and Lainey get married?

265. When Lainey and Onision would have fights, Lainey would frequently tell Sarah that it was "Zillow time" and they would review properties together under the pretense that this was the house they would move into when they ran away together.

266. Lainey also would frequently touch Sarah in a sexual or flirtatious way, such as caressing her legs or tickling her.

267. When individuals on social media started realizing that this minor child was at Onision and Lainey's house, Onision attempted to control the narrative by recording a video titled "Sarah is Leaving."

268. On or about February 21, 2017, Sarah was sent back to Michigan by Onision and Lainey.

269. On or about April 5, 2017, Sarah was invited and returned to Onision and Lainey's home a third time for her third visit to their residence.

270. During the third visit, Onision vacillated by being calm, kind, and friendly, to being angry and mean to Sarah. This variance in attitude sewed discord and instability in Sarah, exacerbated her insecurity, fostered a desire to make her "online hero" like her, and caused her to question what she had done wrong.

271. Sarah returned to Michigan on or about April 13, 2017.

**AGE 17**

272.   It is common with sexual predators that after he or she identifies their target victim, they begin to engage in manipulation.  The next stage of child grooming "involves isolating the person, then creating a secret relationship with them, and the following stage is one where an abuser will initiate sexual control over the person, and later control over the relationship by demanding secrecy."[32]

273.   On or about August 1, 2017, once the internet commentary had settled down, Onision and Lainey invited Sarah to return to their home again, but stated it must be a "secret."

274.   Sarah was 16 and turned 17 a few days after arriving in Gig Harbor.

275.   During her fourth time at their residence, Onision began treating Sarah in a mean and belittling manner again.

276.   Onision effectively broke down Sarah and caused her to feel unwanted, isolated, and alone.

277.   Additionally, Sarah was not the only person with them at the home.  Onision and Lainey invited multiple other people to visit for the purpose of engaging in three-way sexual encounters with these individuals.

278.   The messaging sent was that Onision was kind, friendly, and liked those that were engaging in sexual acts with him – that kindness and friendliness was desperately wanted by Sarah.

279.   Nonetheless, Onision's "jokes" and inappropriate, sexual comments continued and eventually, Sarah worked up the courage to stand up for herself.

280.   On November 4, 2017, Sarah finally told Onision that his comments and "jokes" made her uncomfortable.

---

[32] Erin Corbett, *We Know Grooming is Predatory Behavior, Buy Why is it So Hard to Recognize?* Refinery29 (Aug. 20, 2021), available at https://www.refinery29.com/en-us/2021/08/10636786/grooming-child-sexual-abuse-detection.

281. This comment caused Onision to become enraged and he demanded that Sarah leave their residence.

282. Sarah was sent back to Michigan on or about November 7, 2017.

283. For the next eight (8) months, Sarah and Lainey continued to communicate.

284. On or about July 4, 2018, Sarah traveled back to Gig Harbor for her fifth visit at Onision and Lainey's invitation.

285. Sarah was 17 years old. Onision and Lainey wanted Sarah to return to them as close to her 18th birthday as possible.

286. Upon arrival, Onision changed the way he spoke to Sarah. Instead of being distant, cold, and cruel in his words and demeanor, as he was before, Onision was now warm, friendly, and kind to Sarah. He even greeted her with a hug.

287. This drastic change in his attitude towards this vulnerable child by one of her guardians affected Sarah greatly.

288. Sarah admired and idolized Onision and desperately sought acceptance from him and Lainey.

289. Onision told Sarah when he saw her that she looked like the "girl next door who moved back home but was super-hot."

290. Sarah had felt like a yo-yo with Onision and Lainey over her teenage years. Not only were they her guardians, but Onision vacillated between kindness, silliness, cruelty, and rage. Further, the couple alternated between wanting and inviting Sarah to be with them and then cast her aside.

291. This constant variance and inconsistency caused Sarah to feel uncertain, it negatively affected her own self-image and self-worth, and it exacerbated her symptomology of fear, loneliness, and seeking of acceptance.

292. Although she was still a minor, Onision and Lainey made it known to Sarah that they wished to engage in a three-way sexual act and/or relationship with her.

293.    Further, Onision and Lainey propositioned Sarah to engage in sex acts with them.

294.    Sarah returned to Michigan on August 25, 2018.

295.    At some point around this time period, Lainey proclaimed that she was now a male and that this person would be using the name "Kai" moving forward.[33]

**AGE 18**

296.    Sarah was again invited back and travelled to Washington on our about December 12 – 29, 2018 to spend Christmas with Kai and Onision.

297.    After Onision's fans began protesting Onision and Kai's grooming of Sarah, Onision and Kai both created separate videos denying the allegations.

298.    Onision and Kai both coerced Sarah to create a video addressing the allegations.

299.    In this video posted on January 9, 2019, Sarah stated that she did not engage in sexual relations while underage.

300.    Sarah did not wish to lie and therefore only stated the literal truth.

301.    In reality, Sarah was afraid that she would lose her friendship with Kai and she was afraid she would lose her ability to come to Onision and Kai's house – both things she valued greatly.

302.    As soon as the video was posted, Onision and Kai invited Sarah to visit Gig Harbor again.

303.    On or about January 10, 2019, Onision attempted to manipulate Sarah by conceding he'd been mean, promising to be kind, and then asking her to sign an NDA.  Specifically, Onision texted Sarah:

[33] This complaint will begin calling the person formerly known as Lainey by his new name, Kai, and male pronoun, so as to be consistent with relevant evidence and communications to date.  It should be noted that Lainey and Kai are the same person.

41

> Jan 10, 2019, 2:42 PM
>
> This kinda feels like the last big challenge before all our lives become what we want it to be/ everyone is happy.
>
> I'm sorry for being so rude to you all these years. I hope you understand why I always distanced myself from you.
>
> I'm so glad I finally feel comfortable being real with you and ending the rudeness.
>
> But I am sorry.
>
> Also I think I'll send you an NDA early so I can't talk about you publicly, nor do I want to in the future, your privacy is important. Will get it to you soon, unless you just want to wait till you visit again.

304. Sarah did not want to sign this document and made up excuses to dodge and avoid it.

305. Sarah was able to visit again without signing the NDA.

306. Sarah traveled and arrived in Washington on or about January 16, 2019.

307. On January 17, 2019, the second night after arrival, Sarah, Onision, and Kai were watching television on Onision and Kai's bed, as they had many times before.

308. Onision and Kai began kissing and quickly began having sexual intercourse next to Sarah on the bed.

309. Sarah was sexually inexperienced and was shocked by what was occurring.

310. Nonetheless, without asking permission or confirming consent, Onision pulled Sarah over to where he and Kai were engaging in sexual intercourse.

311. Prior to this moment, Sarah had not consented to sexual activity with either Onision or Kai.

312.    Sarah began kissing Kai.  While Sarah agreed to kiss Kai, Sarah did not intend to engage in any sex acts with Onision.

313.    After kissing, Kai left the bedroom for a few moments, leaving Onision with Sarah.

314.    Without consent, Onision immediately pulled Sarah's pajama bottoms off.

315.    Sarah was petrified and did not want her pants pulled off.

316.    She grabbed the sheet to cover her exposed body.

317.    Onision physically grabbed the sheet and forcibly pulled on it, attempting to pull it off of Sarah.  Sarah desperately pulled back, struggling to remain covered.

318.    When Sarah resisted his attempts, Onision became angry that she was not cooperating with him.

319.    Sarah then attempted to reach for her pajama shorts while holding up the sheet.  Onision, seeing what she was attempting to do, quickly grabbed the shorts and flung them across the room and out of reach.

320.    Sarah remained stationery, gripping the covers over her body.

321.    Thinking that Onision understood that she was not willing to engage in sexual acts with him based on the exchange that just took place, Sarah began kissing Kai again.

322.    Without warning, Onision grabbed Sarah's leg.

323.    Sarah resisted and pulled her leg back, making her refusal to his demands obvious.

324.    Onision, not taking no for an answer, used more force and shoved Sarah in front of him.

325.    Without hesitation and against Sarah's clear resistance to his advances, he attempted to first digitally penetrate Sarah, and then he vaginally penetrated Sarah from behind with his penis.

43

326. Sarah was petrified and she froze, unable to move her limbs.

327. Onision continued to rape Sarah for what felt like an eternity.

328. Sarah began to silently cry, with tears welling up in her eyes, while she was being raped.

329. During this entire incident, Kai did nothing to help Sarah.

330. The next morning, not knowing what to do, Sarah attempted to hide downstairs. Onision found her and picked her up, hugged her, and lavished her with kindness.

331. Sarah did not know what to make of this.

332. Almost immediately after, Onision demanded she sign the NDA documents.

333. Sarah was uncomfortable but executed them because she believe she had no choice after having been groomed for her teenage years, culminating in these moments of vulnerability and control. In other words, when her guardians told her to sign the NDA documents, she had been groomed and conditioned to obey.

334. Upon information and belief, Onision and Lainey's intent with the NDA was to protect themselves from the illegal grooming and rape of Plaintiff.

335. The NDA was not a valid contract.

    a) The parties did not have a meeting of the minds when it was signed.

    b) Sarah signed it under coercion and/or duress, as Sarah had been groomed and conditioned to obey Onision and Lainey's directives.

    c) The NDA lacked any consideration.

    d) The terms were vague, general, and undefined.

336. Even if the NDA had been contractually sound, it was also breached by Onision.

337. Sarah was sent home January 20, 2019.

338.   In the days and/or weeks following Onision's execution of his plan to engage in sex acts with his target, Sarah, he made statements indicating how much he enjoyed engaging in sex acts with Sarah and Kai together, that he missed Sarah, he loved Sarah, and that he wanted to continue the polyamorous relationship.

339.   Sarah, on the other hand, did not feel that she had engaged in a mutual and enjoyable act; rather, she felt confused, ashamed, and afraid.

340.   Sarah did not know how to handle the emotions she was having and was still seeking acceptance and understanding from Kai and Onision.

341.   Sarah returned to Gig Harbor on or about February 16 – 20, 2019 for her eight visit.  Onision purchased her flights.

342.   On or about June 30, 2019, Sarah returned to Onision and Kai's house again for her ninth trip.

343.   On the last night of her trip, the three engaged in sexual activity together.

344.   On the trip back to the airport on or about July 8, 2019, Onision told Sarah she was "his girlfriend" now.  Sarah felt incredibly guilty and used, however, this made her feel validated for the exploitation that had occurred to date.

345.   On or about from July 17 – 23, 2019, Onision knew Kai would be out of town in New Mexico and therefore flew Sarah to their house to spend more time with him.

**ONISION MANUFACTURE A STORY
AND BEGAN VICTIM-SHAMING SARAH**

346.   After Sarah made a few ambiguous statements about what had happened, Onision launched an online attack against her, in the same manner and pattern as multiple of his former sexual partners.

347.   On August 24, 2019, Onision manufactured a story, started victim shaming, and accused Sarah of "blackmailing" and "raping" him.

348.   This method is referred to as "DARVO," which refers to "a reaction perpetrators of wrongdoing, particularly sexual offenders, may display in response to being held accountable for their behavior."[34]

349.   DARVO stands for "Deny, Attack, and Reverse Victim and Offender. The perpetrator or offender may **Deny** the behavior, **Attack** the individual doing the confronting, and **Reverse** the roles of Victim and Offender such that the perpetrator assumes the victim role and turns the true victim -- or the whistle blower -- into an alleged offender. This occurs, for instance, when an actually guilty perpetrator assumes the role of "falsely accused" and attacks the accuser's credibility and blames the accuser of being the perpetrator of a false accusation."[35]

350.   Onision has loudly proclaimed that he was falsely accused and has continued to perpetuate the false narrative of being a "victim" after he strategically lured, enticed, transported, maintained, groomed, and ultimately raped Sarah.

351.   On September 21, 2022, Onision released something he called his "Goodbye Video," which was posted in three parts.

352.   These videos were posted on YouTube and were available for public viewing.

353.   In the first of these three videos, Onision falsely stated that:

- Sarah told Onision that she would "destroy his life" and would only agree not to "destroy his life with lying specifically if she got what she wanted."

- Onision "broke up" with Sarah because he was being "sexually extorted."

- Sarah was "paid" to lie "in association with Discovery Plus" and Chris Hansen.

---

[34]Jennifer J. Freyd, Ph.D., *What is DARVO?*, available at https://dynamic.uoregon. edu/jjf/defineDARVO.html.
[35] *Id.*

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

- Discovery Plus and/or Blackfin paid Sarah "$40,000" "for raping [him]."
- Sarah "raped [him]."
- Sarah performed "sexual extortion" which is "synonymous with rape." Sarah "raped" Onision because she told him she would "destroy his life" or "hurt" him if he did not "sleep with [her]."

354. In the second of these three videos, Onision falsely stated that "Sarah is a rapist."

355. In the third of these three videos, Onision falsely stated that:
- "[Onision] shouldn't have dumped Sarah for raping [him]."
- "[Onision] should have let [himself] get raped" by Sarah.
- "[Onision] should have just left Sarah for raping [him] and not said anything bad about her."

356. Prior to posting this, Onision was given notice as to the defamatory nature of these statements.  These videos were published after notice.

357. Onision has also published similar content on his Twitter feed.

358. As a direct result of these defamatory statements made by Onision, Sarah has caused her reputational harm, she has been baited and harassed online, she is fearful to have a public social media account, she has been publicly humiliated, and emotionally and psychologically harmed.

*YouTube Response*

359. After Sarah moved in, word got out that a minor child had moved in with Onision and Lainey and many people on YouTube were not comfortable with this.

360. Many YouTuber's that were also part of the YPP began to speak about Onision on their own YouTube channels and media began to surface that Onision and his spouse Kai (formerly Lainey) were predators.

47

361. This culminated in a documentary that was released on Discovery Plus that featured Regina, Sarah, and another ex-girlfriend of Onision named Shiloh.

362. It was only after the publication of this documentary that YouTube finally decided to demonetize Onision for violations of their policies on or about January 21, 2021.

363. YouTube stated to news outlet Tubefilter that "it took action because Onision violated the Partner Program's Creator Responsibility guidelines. These mandate that partners not engage in behavior (either on- or off-platform) that can cause widespread harm to the YouTube community, and potentially damage the trust among creators, users, and advertisers."[36]

364. Notably, YouTube took away Onision's ability to make money, but did not remove him from the platform.

365. Upon information and belief, Onision is still operating on YouTube without restriction.

366. Upon information and belief, Lainey is still operating on YouTube without restriction.

367. Upon information and belief, YouTube is still profiting from Onision's content; they are simply not profit-sharing with him anymore.

## CAUSES OF ACTION

### COUNT I
**BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591(a)(2) AND 1595**
***(Regina against the YouTube Defendants)***

---

[36] Hale, James, *YouTube Removes Onision From Partner Program, Demonetizes His Channels over Child Safety Concerns*, Tubefilter (Jan. 20, 2021), available at https://www.tubefilter.com/2021/01/20/youtube-onision-partner-program-demonetized/.

368. Plaintiff Regina Alonso realleges and incorporate by reference paragraphs 1-380 as if fully incorporated herein.

369. Defendant knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

370. Defendants' conduct was in or affected interstate and/or foreign commerce.

371. Regina was a minor during all relevant time periods pertinent to this lawsuit.

372. Defendants knew, or were in reckless disregard of the fact, that Regina had not attained the age of 18.

373. Lainey groomed Regina to engage in a relationship with her, exchange nude photographs with her, caused minor Regina to have strong romantic feelings for her.

374. Lainey, in coordination with Onision, then used that grooming to lure, recruit, solicit, and entice Regina to travel to their house for the purpose of engaging in sex acts with her.

375. YouTube was notified multiple times that Onision was harming young people with his platform, but continued to profit-share with him and did not curtail his harmful abuse of the Terms of Service and Community Guidelines.

376. Defendant YouTube knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

377. Defendant YouTube knowingly benefited from such participation by receiving financial compensation and/or something of value for its participation in the venture.

378. Plaintiff Regina was offered something of value for engaging in sex acts; to-wit: Onision and Lainey were going to pay for the cost of transportation to

their residence, they allowed Regina to serve as a volunteer moderator on their channels which made Regina feel special, and Lainey, acting in concert with Onision, showered Regina with love and affection which was extremely valuable to Regina.

379. Lainey and Onision received something of value as part of the grooming and enticement for sex trafficking; to-wit: Lainey was sent CSAM images of Regina upon request and Regina became a volunteer moderator for the Onision and Lainey forums.

380. Defendants' conduct has caused Regina serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## COUNT II

### CIVIL REMEDIES FOR PERSONAL INJURIES RELATED TO SEX TRAFFICKING
### 18 U.S.C. §§ 2255 AND 1591(a)
### (*Regina against YouTube Defendants*)

381. Plaintiff Regina Alonso realleges and incorporate by reference paragraphs 1-380 as if fully incorporated herein.

382. Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. § 1591(a), occurring within the territorial jurisdiction of the United States.

383. Defendants' conduct was in or affected interstate and/or foreign commerce.

384. Regina was a minor during all relevant time periods pertinent to this lawsuit.

385. Defendants knew, or were in reckless disregard of the fact, that Regina had not attained the age of 18.

Case 3:25-cv-05594-JHC    Document 121    Filed 05/13/24    Page 51 of 69

386. At all relevant times to this lawsuit, Defendants Lainey and Onision were adults.

387. Regina was a victim of sex trafficking, as set forth in 18 U.S.C. § 1591(a) which provides that any person commits a federal crime who:

> "knowingly (1) […] recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in [the same],
>
> knowing, or, […] in reckless disregard of the fact, that means of force, threats of force, fraud, coercion […] will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act […]"

388. Lainey groomed Regina to engage in a relationship with her, exchange nude photographs with her, caused minor Regina to have strong romantic feelings for her.

389. Lainey, in coordination with Onision, then used that grooming to lure, recruit, solicit, and entice Regina to travel to their house for the purpose of engaging in sex acts with her.

390. YouTube was notified multiple times that Onision was harming young people with his platform, but continued to profit-share with him and did not curtail his harmful abuse of the Terms of Service and Community Guidelines.

391. Defendant YouTube knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

392.   Defendant YouTube knowingly benefited from such participation by receiving financial compensation and/or something of value for its participation in the venture.

393.   Regina was offered something of value for engaging in sex acts; to-wit: Onision and Lainey were going to pay for the cost of transportation to their residence, they allowed Regina to serve as a volunteer moderator on their channels which made Regina feel special, and Lainey, acting in concert with Onision, showered Regina with love and affection which was extremely valuable to Regina.

394.   Lainey and Onision received something of value as part of the grooming and enticement for sex trafficking; to-wit: Lainey was sent CSAM images of Regina upon request and Regina became a volunteer moderator for the Onision and Lainey forums.

395.   As a proximate result of Defendants' violations of 18 U.S.C. § 1591(a), Regina suffered serious harm and personal injury, including, without limitation, physical, psychological, financial, and reputational harm.

396.   18 U.S.C. § 2255 provides that any person who is a victim of a violation of one of several federal laws prohibiting sexual offenses against children, including 18 U.S.C. § 1591, and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

397.   Additionally, § 2255 authorizes the award of "punitive damages and such other preliminary and equitable relief as the court determines to be appropriate."

398.   Regina has suffered personal injury as a result of Defendants' violations of the federal laws listed in paragraph (a) of 18 U.S.C. § 2255.

399.   Regina intends to prove her actual damages as a result of each of the Defendants actions.

400.    At minimum, Regina intends to seek liquidated damages in the amount of $150,000 against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate.

401.    18 U.S.C. § 2255 contains non–limiting language which allows Regina to remedy violations of 18 U.S.C. §§ 1591(a) and other criminal predicates under Chapter 110 that do not benefit from CDA 230 immunity.

## COUNT III

### CIVIL REMEDIES FOR PERSONAL INJURIES RELATED TO COERCION AND ENTICEMENT
### 18 U.S.C. §§ 2255 AND 2422
### (*Regina against YouTube Defendants*)

402.    Plaintiff Regina Alonso realleges and incorporate by reference paragraphs 1-380 as if fully incorporated herein.

403.    Defendants each knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. § 2422, occurring within the territorial jurisdiction of the United States.

404.    Defendants' conduct was in or affected interstate and/or foreign commerce.

405.    Regina was a minor during all relevant time periods pertinent to this lawsuit.

406.    Defendants knew, or were in reckless disregard of the fact, that Regina had not attained the age of 18.

407.    At all relevant times to this lawsuit, Defendants Lainey and Onision were adults.

408.   Regina was a victim of sex trafficking, as set forth in 18 U.S.C. § 2422 which provides that any person commits a federal crime who:

> "knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, […] to engage in […] any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, [… or]
>
> using […] means of interstate or foreign commerce, […] knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in […] any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, […]"

409.   Lainey groomed, persuaded, induced, enticed, and/or coerced Regina to engage in a relationship with her, exchange nude photographs with her, caused minor Regina to have strong romantic feelings for her.

410.   Lainey, in coordination with Onision, then used that grooming to lure, persuade, induce, entice, and/or coerce Regina to travel to their house in Washington State for the purpose of engaging in sex acts with her while she was a minor.

411.   YouTube was notified and had full knowledge that Onision was using their platform to groom, lure, persuade, induce, entice, or coerce children with his platform, but continued to profit-share with him and did not curtail his harmful abuse of the Terms of Service and Community Guidelines.

412.   As a proximate result of Defendants' violations of 18 U.S.C. § 2422, Plaintiff suffered serious harm and personal injury, including, without limitation, physical, psychological, financial, and reputational harm.

413.   18 U.S.C. § 2255 provides that any person who is a victim of a violation of one of several federal laws prohibiting sexual offenses against children, including 18 U.S.C. § 2422, and who suffers personal injury as a result of such violation shall

recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

414. Additionally, § 2255 authorizes the award of "punitive damages and such other preliminary and equitable relief as the court determines to be appropriate."

415. Regina has suffered personal injury as a result of Defendants' violations of the federal laws listed in paragraph (a) of 18 U.S.C. § 2255.

416. Regina intends to prove her actual damages as a result of each of the Defendants actions.

417. At minimum, Regina intends to seek liquidated damages in the amount of $150,000 against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate.

418. 18 U.S.C. § 2255 contains non–limiting language which allows Regina to remedy violations of 18 U.S.C. §§ 2422 and other criminal predicates under Chapter 110 that do not benefit from CDA 230 immunity.

## COUNT IV

**VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT**
**18 U.S.C. §§ 1591(a)(1) and 1595**
(*Sarah against Defendants Onision and Lainey*)

419. Plaintiff Sarah realleges and incorporate by reference paragraphs 1-380 as if fully incorporated herein.

420. Defendants Onision and Lainey knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C.

§§ 1591(a)(1) and 1595(a), occurring within the territorial jurisdiction of the United States.

421. Defendants Onision and Lainey's conduct was in or affected interstate and/or foreign commerce.

422. Sarah was a minor of 14 years old when the allegations began and the trafficking of Sarah continued and was ongoing until Sarah was 18 years old, whereupon it finally concluded.

423. Both Onision and Lainey knew, or were in reckless disregard of the fact, that Sarah had not attained the age of 18 for the times when Sarah was a minor during this trafficking activity.

424. Lainey groomed Sarah to believe there was a romantic connection between the two. Lainey also groomed Sarah, knowing Sarah admired and looked up to her as a celebrity.

425. Lainey, in coordination with Onision, then used that grooming to lure, recruit, solicit, and entice minor Sarah to travel to their house for the purpose of engaging in sex acts with her.

426. To further maintain power and control over Sarah, Lainey and Onision obtained power of attorney and guardianship over Sarah.

427. While an adult at the age of 18, after years of grooming, Sarah was pushed to participate in a "three-some" with Onision and Lainey.

428. While Sarah only agreed to engage in kissing with Lainey, Onision then used the opportunity to rape Sarah.

429. Lainey participated in the sexual acts while Onision and was therefore engaged in the act of raping Sarah.

430. Plaintiff Sarah received something of value for engaging in sex acts; to-wit: Onision and Lainey allowed her to live with them, they paid for some of her travel to and from their house, they allowed her to participate in Onision's YouTube

videos on his channel, and Lainey, acting in concert with Onision, showered Sarah with love and affection which was extremely valuable to Sarah.

431.    Onision received something of value as part of the sex trafficking; to-wit: Onision was able to rape Sarah and achieve a sexual conquest over this young girl.

432.    Defendants Lainey and Onision's conduct has caused Sarah serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## COUNT V

### BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591(a)(2) AND 1595
(*Sarah against All Defendants*)

433.    Plaintiff Sarah realleges and incorporate by reference paragraphs 1-380 as if fully incorporated herein.

434.    Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

435.    Defendants' conduct was in or affected interstate and/or foreign commerce.

436.    Sarah was a minor of 14 years old when the allegations began and the trafficking of Sarah continued and was ongoing until Sarah was 18 years old, whereupon it finally concluded.

437.    Both Onision and Lainey knew, or were in reckless disregard of the fact, that Sarah had not attained the age of 18 for the times when Sarah was a minor during this trafficking activity.

438. Lainey groomed Sarah to believe there was a romantic connection between the two. Lainey also groomed Sarah, knowing Sarah admired and looked up to her as a celebrity.

439. Lainey, in coordination with Onision, then used that grooming to lure, recruit, solicit, and entice minor Sarah to travel to their house for the purpose of engaging in sex acts with her.

440. To further maintain power and control over Sarah, Lainey and Onision obtained power of attorney and upon information and belief, guardianship, over Sarah.

441. While an adult at the age of 18, after years of grooming, Sarah was pushed to participate in a "three-some" with Onision and Lainey.

442. While Sarah only agreed to engage in kissing with Lainey, Onision then used the opportunity to rape Sarah.

443. Lainey participated in the sexual acts while Onision and was therefore engaged in the act of raping Sarah.

444. YouTube was notified multiple times that Onision was harming young people with his platform, but continued to profit-share with him and did not curtail his harmful abuse of the Terms of Service and Community Guidelines.

445. Other YouTubers began making videos and asking YouTube to intervene because of the harm that was occurring specifically to Sarah when Onision and Lainey had moved this minor child into their home and were grooming her.

446. Defendant YouTube knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

447. Defendant YouTube knowingly benefited from such participation by receiving financial compensation and/or something of value for its participation in the venture.

448. Defendants were collectively participating in a venture in which they knew or should have known was engaging in sex trafficking.

449. Plaintiff Sarah received something of value for engaging in sex acts; to-wit: Onision and Lainey allowed her to live with them, they paid for her travel to and from their house, they allowed her to participate in Onision's YouTube videos on his channel, and Lainey, acting in concert with Onision, showered Sarah with love and affection which was extremely valuable to Sarah.

450. Onision received something of value as part of the sex trafficking; to-wit: Onision was able to rape Sarah and achieve a sexual conquest over this young girl.

451. Defendants' conduct has caused Sarah serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## COUNT VI

### CIVIL REMEDIES FOR PERSONAL INJURIES RELATED TO SEX TRAFFICKING
### 18 U.S.C. §§ 2255 AND 1591(a)
### (*Sarah against All Defendants*)

452. Plaintiff Sarah realleges and incorporate by reference paragraphs 1-380 as if fully incorporated herein.

453. Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. § 1591(a), occurring within the territorial jurisdiction of the United States.

454. Defendants' conduct was in or affected interstate and/or foreign commerce.

455. Sarah was a minor of 14 years old when the allegations began and the trafficking of Sarah continued and was ongoing until Sarah was 18 years old, whereupon it finally concluded.

456. Both Onision and Lainey knew, or were in reckless disregard of the fact, that Sarah had not attained the age of 18 for the times when Sarah was a minor during this trafficking activity.

457. At all relevant times to this lawsuit, Defendants Lainey and Onision were adults.

458. Sarah was a victim of sex trafficking, as set forth in 18 U.S.C. § 1591(a) which provides that any person commits a federal crime who:

> "knowingly (1) […] recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in [the same],
>
> knowing, or, […] in reckless disregard of the fact, that means of force, threats of force, fraud, coercion […] will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act […]"

459. Lainey groomed Sarah to believe there was a romantic connection between the two. Lainey also groomed Sarah, knowing Sarah admired and looked up to her as a celebrity.

460. Lainey, in coordination with Onision, then used that grooming to lure, recruit, solicit, and entice minor Sarah to travel to their house for the purpose of engaging in sex acts with her.

461. To further maintain power and control over Sarah, Lainey and Onision obtained power of attorney and upon information and belief, guardianship, over Sarah.

462. While an adult at the age of 18, after years of grooming, Sarah was pushed to participate in a "three-some" with Onision and Lainey.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

463. While Sarah only agreed to engage in kissing with Lainey, Onision then used the opportunity to rape Sarah.

464. Lainey participated in the sexual acts while Onision raped Sarah and was therefore engaged in the act of raping Sarah.

465. YouTube was notified multiple times that Onision was harming young people with his platform, but continued to profit-share with him and did not curtail his harmful abuse of the Terms of Service and Community Guidelines.

466. Other YouTubers began making videos and asking YouTube to intervene because of the harm that was occurring specifically to Sarah when Onision and Lainey had moved this minor child into their home and were grooming her.

467. Defendant YouTube knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

468. Defendant YouTube knowingly benefited from such participation by receiving financial compensation and/or something of value for its participation in the venture.

469. Defendants were collectively participating in a venture in which they knew or should have known was engaging in sex trafficking.

470. Sarah received something of value for engaging in sex acts; to-wit: Onision and Lainey allowed her to live with them, they paid for her travel to and from their house, they allowed her to participate in Onision's YouTube videos on his channel, and Lainey, acting in concert with Onision, showered Sarah with love and affection which was extremely valuable to Sarah.

471. Onision received something of value as part of the sex trafficking; to-wit: Onision was able to rape Sarah and achieve a sexual conquest over this young girl.

472. As a proximate result of Defendants' violations of 18 U.S.C. § 1591(a), Sarah suffered serious harm and personal injury, including, without limitation, physical, psychological, financial, and reputational harm.

473. 18 U.S.C. § 2255 provides that any person who is a victim of a violation of one of several federal laws prohibiting sexual offenses against children, including 18 U.S.C. § 1591, and who suffers personal injury as a result of such violation shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

474. Additionally, § 2255 authorizes the award of "punitive damages and such other preliminary and equitable relief as the court determines to be appropriate."

475. Sarah has suffered personal injury as a result of Defendants' violations of the federal laws listed in paragraph (a) of 18 U.S.C. § 2255.

476. Sarah intends to prove her actual damages as a result of each of the Defendants actions.

477. At minimum, Sarah intends to seek liquidated damages in the amount of $150,000 against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate.

478. 18 U.S.C. § 2255 contains non–limiting language which allows Sarah to remedy violations of 18 U.S.C. §§ 1591(a) and other criminal predicates under Chapter 110 that do not benefit from CDA 230 immunity.

**COUNT VII**

**CIVIL REMEDIES FOR PERSONAL INJURIES RELATED TO COERCION AND ENTICEMENT 18 U.S.C. §§ 2255 AND 2422**

**(*Sarah against All Defendants*)**

479.    Plaintiff Sarah realleges and incorporate by reference paragraphs 1-380 as if fully incorporated herein.

480.    Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. § 2422, occurring within the territorial jurisdiction of the United States.

481.    Defendants' conduct was in or affected interstate and/or foreign commerce.

482.    Plaintiff Sarah was a minor of 14 years old when the allegations began and the trafficking of Sarah continued and was ongoing until Sarah was 18 years old, whereupon it finally concluded.

483.    Both Onision and Lainey knew, or were in reckless disregard of the fact, that Sarah had not attained the age of 18 for the times when Sarah was a minor during this trafficking activity.

484.    At all relevant times to this lawsuit, Defendants Lainey and Onision were adults.

485.    Plaintiff Sarah was a victim of sex trafficking, as set forth in 18 U.S.C. § 2422 which provides that any person commits a federal crime who:

> "knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, […] to engage in […] any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, [… or]
> using […] means of interstate or foreign commerce, […] knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in […] any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, […]"

486. Lainey groomed Sarah to believe there was a romantic connection between the two. Lainey also groomed Sarah, knowing Sarah admired and looked up to her as a celebrity.

487. Lainey, in coordination with Onision, then used that grooming to lure, recruit, solicit, and entice minor Sarah to travel to their house for the purpose of engaging in sex acts with her.

488. To further maintain power and control over Sarah, Lainey and Onision obtained power of attorney and upon information and belief, guardianship, over Sarah.

489. While an adult at the age of 18, after years of grooming, Sarah was pushed to participate in a "three-some" with Onision and Lainey.

490. While Sarah only agreed to engage in kissing with Lainey, Onision then used the opportunity to rape Sarah.

491. Lainey participated in the sexual acts while Onision and was therefore engaged in the act of raping Sarah.

492. YouTube was notified that Onision was using their platform to groom, lure, persuade, induce, entice, or coerce children with his platform, but continued to profit-share with him and did not curtail his harmful abuse of the Terms of Service and Community Guidelines.

493. Other YouTubers began making videos and asking YouTube to intervene because of the harm that was occurring specifically to Sarah when Onision and Lainey had moved this minor child into their home and were grooming her.

494. As a proximate result of Defendants' violations of 18 U.S.C. § 2422, Sarah suffered serious harm and personal injury, including, without limitation, physical, psychological, financial, and reputational harm.

495. 18 U.S.C. § 2255 provides that any person who is a victim of a violation of one of several federal laws prohibiting sexual offenses against children, including 18 U.S.C. § 2422, and who suffers personal injury as a result of such violation shall

recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.

496.   Additionally, § 2255 authorizes the award of "punitive damages and such other preliminary and equitable relief as the court determines to be appropriate."

497.   Sarah has suffered personal injury as a result of Defendants' violations of the federal laws listed in paragraph (a) of 18 U.S.C. § 2255.

498.   Sarah intends to prove her actual damages as a result of each of the Defendants actions.

499.   At minimum, Sarah intends to seek liquidated damages in the amount of $150,000 against Defendants, as well as the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred, prejudgment and post-judgment interest, and such other relief as the Court deems appropriate.

500.   18 U.S.C. § 2255 contains non–limiting language which allows Sarah to remedy violations of 18 U.S.C. §§ 2422 and other criminal predicates under Chapter 110 that do not benefit from CDA 230 immunity.

## COUNT VIII

### DEFAMATION PER SE
*(Sarah against Defendant Onision)*

501.   Plaintiff Sarah realleges and incorporate by reference paragraphs 1-380 as if fully incorporated herein.

502.   Defendant Onision uttered and published words imputing a lack of chastity, dishonesty, and criminality to Sarah in his "Goodbye" videos.

503. These videos were posted on YouTube on September 21, 2022 and were available for public viewing.

504. These videos were in fact viewed by many people.

505. In the first of these three videos, Onision falsely stated that:

- Sarah told Onision that she would "destroy his life" and would only agree not to "destroy his life with lying specifically if she got what she wanted."

- Onision "broke up" with Sarah because he was being "sexually extorted."

- Sarah was "paid" to lie "in association with Discovery Plus" and Chris Hansen.

- Discovery Plus and/or Blackfin paid Sarah "$40,000" "for raping [him]."

- Sarah "raped [him]."

- Sarah performed "sexual extortion" which is "synonymous with rape." Sarah "raped" Onision because she told him she would "destroy his life" or "hurt" him if he did not "sleep with [her]."

506. In the second of these three videos, Onision falsely stated that:

- "Sarah is a rapist."

507. In the third of these three videos, Onision falsely stated that:

- "[Onision] shouldn't have dumped Sarah for raping [him]."

- "[Onision] should have let [himself] get raped" by Sarah.

- "[Onision] should have just left Sarah for raping [him] and not said anything bad about her."

508. Sarah has been discussed openly and frequently on online forums. Individuals have researched who Sarah is and harassed her as a result of Onision's publications.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

509.    As a direct and proximate cause of the foregoing, Sarah has suffered damages to her feelings, which have formed as psychological and emotional injuries, emotional distress, and mental anguish.

## COUNT VIX

### NEGLIGENCE PER SE
*(All Plaintiffs against YouTube Defendants)*

510.    Plaintiffs realleges and incorporate by reference paragraphs 1-380 as if fully incorporated herein.

511.    At all times, the YouTube Defendants had an obligation to comply with applicable statutes and regulations, including but not limited to 18 U.S.C. §§ 2258A, 2258B.

512.    The YouTube Defendants owed a heightened duty of care to minor users to adhere to federal statutes implemented for the safety of children online.

513.    The YouTube Defendants' respective actions as described herein violated these statutes and regulations, as well as other federal laws.

514.    YouTube Defendants have an ongoing duty to meet the requirements of 18 U.S.C. § 2258A by reporting to NCMEC the apparent violation by Onision of 18 U.S.C. § 1591.

515.    Despite being notified that Onision was using his YouTube channel to traffic children, YouTube has still failed to meet the requirements of 18 U.S.C. § 2258A by not reporting to NCMEC the apparent violation by Onision of 18 U.S.C. § 1591 involving Plaintiffs.

516.    Plaintiffs are within the class of persons that these statutes and regulations are intended to protect; to-wit: minors who used YouTube are within the scope of persons protected by 18 U.S.C. § 2258A.

517.   As a direct and proximate result of The YouTube Defendants' statutory violations, Plaintiffs suffered serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand judgment against all the Defendants on each of the above-referenced claims and Counts and as follows:

a.  That the Court award Plaintiff compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

b.  That the Court award punitive or exemplary damages in an amount to be determined at trial;

c.  That the Court award to Plaintiffs, in all counts allowing for such award, the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

d.  That the Court award pre- and post-judgment interest at the maximum legal rate;

e.  That the Court award Plaintiffs actual damages pursuant to 18 U.S.C. § 2255(a);

f.  That the Court award Plaintiffs of liquidated damages in the amount of $150,000 from each of Defendants for violations pursuant to 18 U.S.C. § 2255(a);

g.  That the Court grant all such other relief as it deems just and proper; and

h.  That the Court retain jurisdiction of this matter to ensure all forms of relief it deems appropriate.


## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT

DATED: May 13 2024

*/s/ Lisa D. Haba*
Lisa D. Haba
**THE HABA LAW FIRM, P.A.**
Lisa D. Haba (*Pro hac vice*)
*lisahaba@habalaw.com*
1220 Commerce Park Dr., Ste 207
Longwood, FL 32779
Telephone: (844) 422-2529

**MARSH LAW FIRM PLLC**
Robert Y. Lewis
Margaret E. Mabie (*Pro hac vice*)
*margaretmabie@marsh.law*
31 Hudson Yards, 11th Floor
New York, New York 10001
Telephone: (315) 296-9046

*Attorneys for Plaintiffs*

*Sarah and Regina Alonso v. Google, et. al.*, Case No. 3:23-cv-05523-VC
AMENDED COMPLAINT